# JUDGE KARAS

Paul W. Garrity
Sean R. Flanagan
KELLEY DRYE & WARREN LLP
101 Park Avenue
New York, NY 10178
(212) 808-7800
Attorneys for Plaintiffs

**08 CIV 7401**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BARREVELD INTERNATIONAL, INC. and DK LIVING, INC. | CASE NO. |
| Plaintiffs, | |
| v. | **COMPLAINT** |
| MEGACOLOR CORPORATION, and MEGAMAIL CORPORATION | |
| Defendants. | |

Plaintiffs, BARREVELD INTERNATIONAL, INC., and DK LIVING, INC. (collectively, the "Plaintiffs"), as and for their Complaint against the above-named defendants, through their undersigned counsel, alleges, upon knowledge to their own acts and upon information and belief as to all other matters, as follows:

## THE PARTIES

1.     Plaintiff Barreveld International, Inc. ("Barreveld"), is a New York corporation with its principal place of business located at 3027 Route 9, Cold Spring, NY 10516.

2.     Plaintiff DK Living, Inc. ("DK Living"), is a New York corporation with its principal place of business located at 3027 Route 9, Cold Spring, NY 10516.

3.      Upon information and belief, defendant MegaColor Corporation ("MegaColor"), is a Florida corporation with its principal place of business located at 1388 SW 8th Street, Pompano Beach, FL 33069.

4.      Upon information and belief, defendant MegaMail Corporation ("MegaMail"), is a Florida corporation with its principal place of business located at 1571 Heil Quaker Blvd., Nashville, TN 37086 and is a sister corporation to MegaColor.

## JURISDICTION AND VENUE

5.      This Court has diversity jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a)(1).  The parties are citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

6.      Venue is proper in this District in accordance with 28 U.S.C. § 1391(a)(3) and (c) because MegaColor is a licensed foreign corporation in New York State and MegaMail regularly transacts business in New York State.

## FACTUAL ALLEGATIONS

**Background**

7.      The Plaintiffs are high-end home furnishings and decor wholesalers who sell their products to various retail stores throughout the country.

8.      Throughout the year, the Plaintiffs hold trade shows at their showrooms located in Atlanta, Georgia ("Atlanta"), Las Vegas, Nevada ("Las Vegas"), New York, New York ("New York") and High Point, North Carolina ("High Point").

9.      During these trade shows, buyers representing retail stores come from around the country to view the Plaintiffs' merchandise and order the Plaintiffs' products to sell at their retail stores to the general public.

10.     Prior to the trade show season, the Plaintiffs create and mail catalogs to buyers who have purchased merchandise from the Plaintiffs within the past four years (the "Customers"). These catalogs are used by the Plaintiffs to, among other things, remind their Customers that a trade show is going to take place, give their Customers an opportunity to review the merchandise that the Plaintiffs will be offering in the upcoming season and to allow their Customers to order merchandise via the catalog by filling out order forms contained within the catalog.

11.     The catalogs, therefore, are a vital tool for the Plaintiffs to market and sell their products to their Customers and to ensure that their trade shows will be successful.

12.     Defendant MegaColor is a printing company that specializes in, among other things, the printing and binding of catalogs for corporations.

13.     MegaColor has a 130,000 square foot printing facility in Nashville, Tennessee that provides "design, bindery [and] mailing" (the "Nashville Facility").

14.     The Plaintiffs have used MegaColor to print and bind their catalogs in the past. MegaColor, therefore, was fully aware of the importance of printing, binding and mailing these catalogs on a timely basis.

**MegaColor Agrees to Print the Plaintiffs' Fall Catalog**

15.     On or about February 7, 2008, Mr. Stephen Schembari ("Schembari"), representing the Plaintiffs, contacted Mr. John Maasik ("Maasik"), MegaColor's sales representative in its Hastings-on-Hudson, New York office about MegaColor's interest in printing another catalog for the Plaintiffs' upcoming trade shows in July and August of 2008, to be held in Atlanta, Las Vegas and New York to showcase the Plaintiffs' fall collection.

16.     Accordingly, the Plaintiffs needed to have the catalogs printed and shipped prior to their trade shows which were scheduled to begin in Atlanta on July 8, 2008.

17.     Maasik replied, via email, that MegaColor would "[o]f course be interested in the printing portion of the project, let me know what the final specs are and can let you know.  We will have our web presses up and running in Nashville in the 2nd week of March."

18.     On or about April 2, 2008, Maasik sent Schembari an order form confirming that MegaColor was going to print 38,000 catalogs with a shipping date scheduled for June 15, 2008 (the "Agreement").  According to the Agreement, MegaColor was to mail, via United States Postal Service bulk mailing, 29,000 copies of the catalog to the Plaintiffs' Customers and send the remaining catalogs to the Plaintiffs' offices in Cold Spring, New York.

19.     In return, the Plaintiffs were to pay MegaColor $108,500.

20.     Maasik requested that the Plaintiffs pay MegaColor in three installments. The parties agreed that the Plaintiffs would pay MegaColor the first 1/3, or $36,000, on May 1, 2008, the second 1/3, or $36,000, on June 1, 2008 and the balance, or $36,500, would be sent to MegaColor on July 7, 2008 – approximately 20 days after the catalogs were scheduled to be shipped.

21.     On or about April 30, 2008, the Plaintiffs paid MegaColor $36,000, representing their first payment for the printing and binding of the catalogs, according to the Agreement.

22.     On or about May 7, 2008, the Plaintiffs increased the number of pages the catalog would consist of, which also increased the final price for printing and binding the catalogs to $122,728.

23.    The parties also agreed that the Plaintiffs would pay MegaColor $36,000

for its second installment under the Agreement, and the Plaintiffs would pay the balance due,

$55,726 - 20 days after the catalogs were shipped.

24.    On or about May 27, 2008, the Plaintiffs paid MegaColor $36,000,

representing the second installment payment according to the parties' agreement.

**The Plaintiffs Pay MegaMail for the Postage to Mail the Catalogs**

25.    On or about May 31, 2008, Mr. John Vaughn ("Vaughn"), the Mail

Manager from MegaMail, informed Schembari that for MegaMail to mail 29,000 catalogs from

Nashville, Tennessee, it would cost approximately $56,000.

26.    The $56,000 quoted by MegaMail was in addition to the money the

Plaintiffs would pay MegaColor for the printing and binding of the 38,000 catalogs.

27.    As explained in an email dated June 18, 2008, from Mr. Kory

Hershkowitz ("Hershkowitz"), the Vice President of Sales for MegaColor, "[p]ostage is a direct

expense and we do not make money on it so we always require cleared funds before we mail."

28.    Accordingly, the Plaintiffs wired $56,000, on or about June 23, 2008, to

MegaMail's bank account at American National Bank in Oakland Park, Florida (the "Pre-Paid

Postage Payment").

**MegaColor Fails to Print and Bind Catalogs on Time**

29.    On or about June 2, 2008, Schembari and Maasik met in MegaColor's

office in Hastings-on-Hudson to discuss the shipping schedule.  During this meeting, Maasik

informed Schembari that, MegaColor could not meet the June 15, 2008, mailing deadline.  The

Plaintiffs, therefore, reluctantly agreed to move the mailing date from June 15, 2008, to June 27,

2008 – 10 days before the Plaintiffs trade show was scheduled to open in Atlanta.

30.    On or about June 16, 2008, Maasik informed Schembari, that due to certain approvals for which MegaColor was still waiting to receive from the Plaintiffs, MegaColor was a week behind the ship date of June 27, 2008.  Maasik further stated that he "requested a firm ship date from our production manager."

31.    Maasik also re-confirmed, on or about June 16, 2008, that MegaColor was fully aware of the need to ship the catalogs as quickly as possible, "[t]hey are aware in Tennessee [o]f your tight deadlines and I will push to get done as soon as possible."

32.    On or about June 23, 2008 – four days before MegaColor was scheduled to begin mailing the catalog – Maasik assured Schembari that MegaColor was going to try to get out as many catalogs as possible for the June 27th mailing.  Maasik, in an email, wrote, "[a]s of now the covers are printed and the catalog itself will be printing until Wednesday/Thursday this week.  We will bind as many as we can for mailing on Friday."

33.    Maasik, in his email dated June 23, 2008, however, also confirmed that MegaColor would not be able to ship all of the 29,000 catalogs by June 27 and, therefore, requested that the catalogs be shipped on a rolling basis and asked that the Plaintiffs provide a "way to prioritize which zip codes or states we should mail to please let us know, that way we can get those out first and begin generating those cheshire labels."

34.    On or about June 25, 2008 – two days before MegaColor was scheduled to ship the Plaintiffs' catalogs – Schembari proposed that the mailing of the catalogs could be divided into three parts:  MegaColor would ship approximately 7,000 catalogs out on June 27 to Customers located in the Southeastern United States; approximately 11,000 catalogs could be shipped on Saturday June 28, 2008 to Customers in the Mid-Atlantic and Northeastern United

States; and the balance, approximately 10,000 catalogs, shipped on Monday June 30, 2008, to Customers in the Mid-West, Central and Western United States.

35.    Hershkowitz, in response to Schembari's proposed schedule, said that it was impossible for MegaColor to meet the schedule Schembari proposed. Hershkowitz, however, assured the Plaintiffs that "I am still working on getting the first 6000 books out on Friday [June 27] but that would be the most I could possibly get out until at least the middle of next week."

36.    On the morning of June 27, 2008 – the date MegaColor was to ship the Plaintiffs' catalogs – Hershkowitz confirmed that he was "still pushing to get [the] 6,000 catalogs done but it is not looking great."

37.    Approximately two and a half hours later, on June 27, 2008, Hershkowitz reported that MegaColor would not be able to ship any catalogs out that day. Hershkowitz, however, did say, ominously, that he was "doing my best to get some out Monday [June 30] but we are experiencing some unforeseen problems that I am also trying to deal with."

38.    This reference to "unforeseen problems" that MegaColor was "also trying to deal with" was the first time MegaColor admitted that they may not be able to meet the schedule the parties agreed to because of issues that were not being relayed to the Plaintiffs.

39.    On or about June 30, 2008 – 8 days before the Plaintiffs were scheduled to open their trade show in Atlanta – Hershkowitz, in an email to Schembari, informed the Plaintiffs that MegaColor has had some "major problems" and that "[r]ight now I am looking at not being able to have any books ready until this following Monday, July 7."

40.     Later, on or about June 30, 2008, Hershkowitz confirmed that he would, "[u]nless something else happens that I can not predict I will be able to get the 1,000 catalogs to you on Monday July 7th and will ship to your cold spring [sic] office as well."

41.     Maasik, on or about June 30, 2008, also verified that "we [MegaColor] will be shipping 1,000 catalogs for you direct to Atlanta to arrive on Monday July 7."

42.     On or about July 3, 2008, Hershkowitz proposed the following delivery schedule, "MegaColor will deliver the first 1,000 books to Atlanta on 7/7 I can have the first 8,000 – 10,000 books ready to ship or hold for mailing on Wednesday 7/9 I can then get 8,000 – 10,000 done each day until we finish the balance which should be no later than 7/15 but hopefully sooner."

43.     The parties also agreed that the Plaintiffs should pay the balance of the amount the Plaintiffs owed to MegaColor, $55,726, as follows:  $14,700 on July 8, $14,700 on July 9, $14,700 on July 10, and $11,626 on July 11.

44.     On or about July 7, 2008 – 1 day before the Plaintiffs were to open their trade show in Atlanta – Hershkowitz informed the Plaintiffs that MegaColor was unable to bind the "books" because MegaColor had "problems this weekend."  Hershkowitz, however, assured the Plaintiffs that MegaColor was "working on getting the binder going this morning and should have the 1,000 ready late this afternoon."

45.     On or about July 7, 2008, at approximately 4:42 p.m., in response to Schembari's inquiry as to the status of the 1,000 catalogs to be shipped to Atlanta, Hershkowitz emailed Schembari confirming that "we are on schedule for the rest of the books.  I am trying to get an exact time we will be leaving but do not have an answer yet."

46.     At or about 9:06 p.m., on or about July 7, 2008, Hershkowitz e-mailed Schembari, who was awaiting the delivery of the catalogs to the Plaintiffs' showroom in Atlanta, and informed him that MegaColor had been having problems with "our perfect binder all day." Hershkowitz advised that Schembari should "go to the hotel and we will call you as soon as we have a better update."

47.     On or about July 8, 2008, at approximately 1:30 a.m., Hershkowitz, in an e-mail, informed Schembari that MegaColor was "not able to get the perfect binder going tonight. I am sending the mechanics home and will have them in early tomorrow to see if they can get it going in the morning. I will update you in the morning."

48.     On or about July 8, 2008, at approximately 6:00 p.m., Hershkowitz informed Schembari, via e-mail, that MegaColor would be delivering 1,000 catalogs to the Plaintiffs in Atlanta. Hershkowitz also informed Schembari that "this has unfortunately put us behind two days so the first mailing should happen Thursday afternoon [July 10] or Friday [July 11]."

49.     On or about July 9, 2008, the Plaintiffs received 800 catalogs in Atlanta. MegaColor never shipped the remaining 37,200 catalogs.

**Plaintiffs Discover MegaColor's Misrepresentations Regarding**
**The True Reason Behind MegaColor's Failure to Produce the Catalogs**

50.     The Plaintiffs, on or about July 14, 2008, after their trade show in Atlanta, discovered that MegaColor failed to print 48 pages of the catalog.

51.     The Plaintiffs also discovered that the cover of the catalog which MegaColor told them was printed on or about June 23, 2008, was still being held by PDQ Bindery in Nashville, Tennessee ("PDQ") who, upon information and belief, would not release the catalog's covers to the Plaintiffs unless PDQ received the $4,000 for other jobs, including the

Plaintiffs' catalog covers, that it performed for Megacolor and that was allegedly owed to them by MegaColor.

52.    The Plaintiffs, between July 15 and July 17, 2008, sent a courier service to MegaColor's Nashville Facility. The Plaintiffs collected the printed material held by MegaColor and sent it to a third party (the "Third Party Vendor"), for binding and mailing. The Plaintiffs, in part because two trade shows had already been held, asked that the Third Party Vendor only bind 15,000 catalogs and mail 10,000 catalogs instead of the 29,000 that they had originally wanted to mail.

53.    As a result, the Plaintiffs did not have any catalogs available to be mailed prior to their trade shows in Atlanta or Las Vegas. The consequence of not having these catalogs cost the Plaintiffs a substantial amount of money in sales.

54.    Upon information and belief, the "major problems" and "unforeseen problems" that MegaColor alleged to have been having were not, as they lead the Plaintiffs to believe employee related or mechanical problems. Instead, upon information and belief, MegaColor was having financial difficulties which were preventing MegaColor from completing the project.

55.    Upon information and belief, in late June 2008, MegaColor was waiting for a line of credit from its bank which it never received.

56.    Upon information and belief, on or about July 3, 2008, MegaColor laid off 80 of its employees in the Nashville Facility.

57.    Upon information and belief, MegaColor, during the weekend of July 11 through 13, 2008, began to dismantle its printing equipment in the Nashville Facility and began moving the equipment to Florida.

58.     On or about July 16, 2008, the Plaintiffs requested that MegaColor and/or MegaMail return the Pre-Paid Postage Payment wired to MegaMail.

59.     Neither MegaColor nor MegaMail has responded to the Plaintiffs' demand.

## FIRST CLAIM FOR RELIEF
### (Breach of Contract – Against MegaColor)

60.     Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 59 of this Complaint as if fully set forth in this claim for relief.

61.     Plaintiffs and MegaColor entered into an agreement whereby, MegaColor would print and bind 38,000 catalogs.  MegaColor also agreed to have their affiliated company, MegaMail, mail 29,000 copies of the catalog to the Plaintiffs' Customers by June 15.

62.     MegaColor confirmed this agreement by sending an order form to Schembari.

63.     MegaColor failed to print, bind and ship the catalogs.

64.     As a consequence of MegaColor's failure to print, bind and ship the catalogs, MegaColor breached its contract with the Plaintiffs.

65.     As a result of MegaColor's failure to print, bind and ship the catalogs, the Plaintiffs were unable to provide catalogs to their Customers during, and more importantly, before their trade shows in Atlanta, Las Vegas and New York causing the Plaintiffs to lose substantial amounts in sales which the Plaintiffs are still calculating but do not believe the amount of lost sales to be less than $400,000.

66.     Accordingly, the Plaintiffs are entitled to judgment against MegaColor for an amount no less than $400,000.

11

## SECOND CLAIM FOR RELIEF
### (Negligent Misrepresentation – Against MegaColor)

67.     Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 66 of this Complaint as if fully set forth in this claim for relief.

68.     Upon information and belief, MegaColor continuously misrepresented that it would be able to print, bind and ship the catalogs prior to the Plaintiffs' first trade show on July 8, 2008, in Atlanta.  Instead, upon information and belief, MegaColor was in the midst of a financial crisis wherein it could not get funding from banks and proceeded to lay off its employees in the Nashville Facility.

69.     Upon information and belief, MegaColor knew or reasonably should have known that the representations that they would be able to print, bind and mail the catalogs by June 27, 2008, were false because MegaColor knew or reasonably should have known that it would not be able to print, bind or ship the catalogs as required under the Agreement.

70.     Upon information and belief, MegaColor knew that the Plaintiffs would rely on MegaColor's misrepresentations.

71.     The Plaintiffs did, in fact, rely on MegaColor's misrepresentations. Indeed, had MegaColor not made these misrepresentations, the Plaintiffs would have found another vendor that may have either been able to complete the printing, binding and shipping of the catalogs on time, or, may have been able to have catalogs shipped prior to the trade show held in Las Vegas on July 28, 2008.

72.     As a result of MegaColor's misrepresentations, the Plaintiffs were unable to provide catalogs to their Customers during trade shows in Atlanta, Las Vegas and New York causing the Plaintiffs to lose substantial amounts in sales which the Plaintiffs are still calculating but do not believe the amount of lost sales to be less than $400,000.

12

73.     Accordingly, the Plaintiffs are entitled to judgment against MegaColor for an amount no less than $400,000.

### THIRD CLAIM FOR RELIEF
#### (Unjust Enrichment – MegaMailing)

74.     Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 73 of this Complaint as if fully set forth in this claim for relief.

75.     On or about June 23, 2008, at the direction of MegaColor and MegaMail, the Plaintiffs paid MegaMail $56,000 for MegaMail to pay for the postage of shipping 29,000 catalogs which was "a direct expense and [MegaMail] do[es] not make money on it."

76.     MegaMail never mailed a single catalog.

77.     MegaMail has benefited from its possession of the $56,000 it obtained from the Plaintiffs.

78.     MegaMail voluntarily accepted, retained and appreciated the benefit conferred by accepting the Plaintiffs' payment for postage, remaining in possession of said payment and refusing to refund the money to the Plaintiffs.

79.     MegaMail has been unjustly enriched by its possession of the $56,000 it received from the Plaintiffs without having to pay for the postage to ship 29,000 catalogs or to refund the $56,000 back to the Plaintiffs.

80.     The Plaintiffs have demanded for the $56,000 to be returned and MegaMail has not responded.

81.     By reason of the foregoing, it would be inequitable for MegaMail to retain the benefit of the $56,000 and it should thus be determined that MegaMail return the $56,000 to the Plaintiffs plus interest, collection costs and attorneys' fees.

## FOURTH CLAIM FOR RELIEF
### (Conversion – Against MegaMail)

82.     Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 81 of this Complaint as if fully set forth in this claim for relief.

83.     Upon information and belief, MegaMail knowingly, intentionally, wrongfully and tortiously secured possession of the $56,000 wired by the Plaintiffs to cover the postage to mail 29,000 catalogs, with the intent to exercise unauthorized dominion over it to the exclusion of the Plaintiffs rights.

84.     Upon information and belief, MegaMail knowingly, intentionally, wrongfully and tortiously secured possession over the $56,000 wired by the Plaintiffs to cover the postage to mail 29,000 catalogs with the intent to re-distribute the funds to MegaColor to cover the Plaintiffs outstanding balance of $55,726 owed to MegaColor for the printing and binding of 38,000 catalogs.

85.     By reason of the foregoing, MegaMail is liable to the Plaintiffs for $56,000, plus collection costs, interest and attorneys' fees.

86.     By reason of the foregoing, MegaMail is liable to the Plaintiffs for punitive damages, in an amount to be determined at trial, for its deliberate, tortuous misconduct and conversion of the Plaintiffs' property.

## FIFTH CLAIM FOR RELIEF
### (Unjust Enrichment – Against MegaColor)

87.     Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 86 of this Complaint as if fully set forth in this claim for relief.

88.     Upon information and belief, at the direction of MegaColor and MegaMail, the Plaintiffs paid MegaMail $56,000 for MegaMail to pay for the postage of

shipping 29,000 catalogs which is "a direct expense and [MegaMail] do[es] not make money on it."

89.     The Plaintiffs paid MegaColor $72,000 in partial payment of printing and binding 38,000 catalogs on behalf of the Plaintiffs.  Upon shipment of the 38,000 catalogs, the Plaintiffs were to pay MegaColor $55,726, representing the outstanding balance that was owed to MegaColor.

90.     MegaColor failed to complete the printing and binding of the catalogs.

91.     MegaMail never mailed a single catalog.

92.     Upon information and belief, MegaMail, knowingly, intentionally wrongfully and tortiously secured possession of the $56,000 and transferred the funds to MegaColor to cover the outstanding balance that was due by the Plaintiffs for printing, binding and shipping the Plaintiffs' 29,000 catalogs.

93.     MegaColor has benefited from its possession of the $56,000 it obtained from MegaMail.

94.     MegaColor voluntarily accepted, retained and appreciated the benefit conferred by accepting the $56,000 from MegaMail, remaining in possession of said payment and refusing to refund the money to the Plaintiffs.

95.     MegaColor has been unjustly enriched by its possession of the $56,000 it received from MegaMail without having to print, bind or mail the 38,000 catalogs ordered by the Plaintiffs or to refund the $56,000 back to the Plaintiffs.

96.     The Plaintiffs have demanded for the $56,000 to be returned and MegaColor has not responded.

97.    By reason of the foregoing, it would be inequitable for MegaColor to retain the benefit of the $56,000 and it should thus be determined that MegaColor return the $56,000 to the Plaintiffs plus interest, collection costs and attorneys' fees.

## RELIEF REQUESTED

**WHEREFORE**, the Plaintiffs demand that judgment on their Complaint against Defendants MegaColor and MegaMail as follows:

(a)    On the First Claim for Relief, directing payment by defendant MegaColor to the Plaintiffs in an amount to be determined at trial, but no less than $400,000;

(b)    On the Second Claim for Relief, directing payment by defendant MegaColor to the Plaintiffs in an amount to be determined at trial, but no less than $400,000;

(c)    On the Third Claim for Relief, directing payment by defendant MegaMail to the Plaintiffs in an amount of $56,000;

(d)    On the Fourth Claim for Relief, directing payment by defendant MegaMail to the Plaintiffs of compensatory and punitive damages for its tortuous misconduct, conversion, in an amount to be determined at trial;

(e)    On the Fifth Claim for Relief, directing payment by defendant MegaColor to the Plaintiffs, in an amount of $56,000;

(f)    Awarding the Plaintiffs pre-judgment and post-judgment interest against the Defendants;

(g)    Awarding attorneys' fees and other costs and expenses incurred in this proceeding against the Defendants; and

(h)    Awarding the Plaintiffs such other and further relief as this Court deems just, equitable and proper.

## JURY DEMAND

Plaintiffs hereby demands a trial by jury as to all claims.


Dated: August 20, 2008                    KELLEY DRYE & WARREN LLP


                                          By: _____
                                          Paul W. Garrity
                                          Sean R. Flanagan
                                          101 Park Avenue
                                          New York, NY 10178
                                          (212) 808-7800

                                          Attorneys for Plaintiffs
                                          Barreveld International, Inc.
                                          DK Living, Inc.